

FILED

May 29 2018, 7:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Robert H. Ebbs
Theresa L.D. Ebbs
Katherine M. Marshall
Glaser & Ebbs
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS ASSOCIATION

Scott A. Faultless
Craig Kelley & Faultless LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Michael R. Bain
Lauren M. Hardesty
Hume Smith Geddes Green &
Simmons, LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
DEFENSE TRIAL COUNSEL OF
INDIANA

Lucy R. Dollens
Jacob V. Bradley
Quarles & Brady LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.H. a Minor, by Her Parent, A.M.J., and A.M.J. Individually, *Appellants-Plaintiffs,* <br> v. <br> Mary Whipple, *Appellee-Defendant,* and <br> Robert Whipple *(Deceased)* *Defendant Below.* | May 29, 2018 <br><br> Court of Appeals Case No. 48A05-1706-CT-1345 <br><br> Appeal from the Madison Circuit Court <br><br> The Honorable Thomas Newman, Jr., Judge <br><br> Trial Court Cause No. 48C03-1306-CT-101 |

**Robb, Judge.**

## Case Summary and Issue

D.H. ("Child"), through her mother and guardian, A.M.J. ("Mother"), and Mother individually (collectively, the "Appellants"), bring this interlocutory appeal from the trial court's grant of summary judgment on the issue of negligence in favor of Mary Whipple, Mother's mother and Child's maternal grandmother. Appellants present only one question for our review, whether the trial court properly granted summary judgment. Concluding genuine issues of material fact remain, we reverse and remand.

## Facts and Procedural History

Robert Whipple, Child's step-grandfather and Mary's husband until his death in 2017, had a history of child molestation. Robert molested his seven-year-old daughter on multiple occasions in the 1960s and his six-year-old niece on multiple occasions in 1980. As a result of his 1980 conduct, Robert was charged with child molesting, a Class B felony. He confessed to the underlying conduct and accepted a plea agreement involving counseling in lieu of incarceration.

Mary met Robert sometime in 1990 and the two were married on December 6, 1991. For medical reasons, Mary and Robert were unable to have sex during their twenty-six-year marriage. By the time of Mary and Robert's marriage, Mother was an adult and living on her own. Sometime prior to 2009, Mother and Child moved from Indianapolis to Anderson to help with Mary's and

Robert's many health issues. During this time, and often at Mary's invitation, Child would visit and stay the night at the Whipples' home.

[4] These visits increased in December 2009, after Child turned thirteen, because she was no longer eligible to continue attending her daycare facility. Through phone calls with Mary, Mother arranged for Child to stay at the Whipples' home while Mother was at work. Mary, who was working in Indianapolis at the time, told Mother that she would be home shortly after Child was dropped off at the home. Mother would drop Child off around 4:30 p.m. and Mary would arrive home around 5:30 or 6:00 p.m. Mary told Mother that it was "all right" for Child to be with Robert until she returned home from work in Indianapolis. Appendix of Appellants, Volume III at 50. From December 2009 through January 2010, Robert molested Child on some twelve occasions. Child did not initially report the molestations, however, because Robert threatened to kill Mother. Almost two years later, Child met with a detective and reported the molestations, resulting in Robert's arrest. Following a jury trial in May 2013, Robert was found guilty of two counts of child molesting as Class A felonies, and one count of child molesting as a Class C felony. Robert was sentenced to thirty-five years in the Indiana Department of Correction.

[5] In June 2013, Appellants commenced this action by filing a complaint for damages against Robert and Mary. Count I alleged that Robert committed assault, battery, invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Count II alleged negligence on behalf of Mary. Specifically, Appellants allege in Count II:

12. On said occasions when Plaintiff Child was in the custody, care and control of Defendant Mary Whipple, the Defendant had a special responsibility to supervise Plaintiff Child, to keep her from harm and out of danger, to make careful preparations to enable Defendant to be vigilant in ascertaining risks that may occur and to exercise reasonable care for Child's safety and protection.

13. Defendant Mary Whipple was, without limitation:

a) Negligent in her supervision of Child as she knew, or should have known, that Defendant Robert Whipple was sexually molesting and assaulting Child, and Defendant Mary Whipple failed to warn Child and/or [Mother] of the dangers, or otherwise protect Child from said wrongful acts of her husband, Defendant Robert Whipple, and the harm to result therefrom; and,

b) Negligent and careless in failing to provide a safe environment and/or premises for Plaintiff Child, a child of thirteen (13) years of age, when Defendant Mary Whipple accepted the responsibility to care for Child and was entrusted with her safety and well-being.

App. of Appellants, Vol. II at 18-19.

[6] Mary denied the allegations and eventually filed a motion for summary judgment.[1] As evidence in opposition to the motion, Appellants designated the affidavit of Scott Sanderson, a detective with the Anderson Police Department,

---

[1] Robert died in 2017 while serving his sentence and the allegations against Robert are not involved in this appeal.

who had interviewed both Robert and Mary in the course of investigating the

molestations. Detective Sanderson's affidavit included the following:

> 10. I interviewed Robert E. Whipple on February 24, 2012, at the Anderson Police Department, in the course of my investigation of the State of Indiana v. Robert E. Whipple, Cause Number 48C06-1204-FA-000655 case; and,
>
>> a. During that interview, Robert E. Whipple admitted to molesting two children, other than [Child], in the past; one was his biological daughter, and the other was his niece by marriage.
>>
>> b. During that interview, Robert E. Whipple informed me that he had told his wife Mary Whipple that he had molested a girl in the past.
>>
>> c. It was and is my impression that, prior to December 20, 2009, Robert E. Whipple informed Mary Whipple that he molested a child.
>>
>> d. A true and accurate copy of the Anderson Police Department Advice of Rights and my hand written notes which were contained on the back side of the Advice of Rights are attached hereto as Exhibit B.
>>
>> e. A true and accurate copy of my type written notes of my February 24, 2012 interview with Robert E. Whipple are attached hereto as Exhibit C.
>
> 11. I spoke in person with Mary Whipple on February 24, 2012, while she was at the Anderson Police Department with Robert E. Whipple; and,

a. During that conversation, Mary Whipple stated that a long time ago Robert E. Whipple told her that he had what she referred to as a "small or minor indiscretion" a long time ago.

b. It was and is my impression that the "small or minor indiscretion" that Mary Whipple was referring was child molest.

c. It was and is also my impression that Mary Whipple had knowledge prior to December 20, 2009 that Robert E. Whipple molested at least one (l) child.

d. During that conversation, I spoke with Mary Whipple about the allegations [Child] had made against Robert E. Whipple; and, although she denied the allegations, she advised basically that it was all her fault because she worked all of the time, and Robert E. Whipple was home alone with [Child].

e. A true and accurate copy of my hand written notes which were contained on the back side of the Advice of Rights are attached hereto as Exhibit B.

f. A true and accurate copy of my type written notes of my February 24, 2012 conversation with Mary Whipple are attached hereto as Exhibit C.

App. of Appellants, Vol. III at 85-86.

[7]     Appellants' designated evidence also included the following testimony from Mary's deposition:

[Question]:   If Detective Sanderson indicated that you made a statement to him that you were aware of indiscretions that [Robert] had had, would you have any reason to dispute that?

[Mary]:   If I was aware of any indiscretions. I don't know if I – don't know if I would have said that. I wouldn't dispute anything I would have said to him because if I said to him, it's on record, but you have to remember that this is just such a blur, I can't remember specifics.

[Question]:   Do you recall using the words indiscretions – or word indiscretion?

[Mary]:   That would be a word I would use.

[Question]:   And what would you use that word for?

[Mary]:   Well, these issues, these sexual issues are most definitely indis- -- you know, it's wrong.

[Question]:   When did you first learn about what you're calling indiscretions?

[Mary]:   I would say when I was either with Child Protective Services or Investigator Brooks. And I don't know what dates or years.

[Question]:   Detective Brooks would be after 2009. Would CPS be before or after 2009?

[Mary]:   It – it ran very close. I don't know.

*Id.* at 33.  After a hearing, the trial court granted Mary's motion for summary judgment.  Appellants now appeal.

# Discussion and Decision

## I. Standard of Review

[8]     When reviewing a grant or denial of a motion for summary judgment, our standard of review is the same as it was for the trial court in ruling on the motion initially.  *Knighten v. E. Chi. Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015).  The moving party carries the burden of showing there are no genuine issues of material fact and it is entitled to judgment as a matter of law.  *Id.*  "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences."  *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).  Unlike federal practice, the moving party must go beyond merely showing the party carrying the burden of proof lacks evidence on a necessary element and "affirmatively negate an opponent's claim."  *Id.*  If the moving party carries Indiana's "more onerous burden," then the non-moving party must present evidence establishing the existence of a genuine issue of material fact.  *Id; Knighten*, 45 N.E.3d at 791.  We consider only the evidence the parties designated to the trial court and we construe all factual inferences in favor of the non-moving party, resolving all doubts regarding the existence of a material issue against the moving party.  *See* Ind. Trial Rule 56(C), (H); *Knighten*, 45 N.E.3d at 791.

Indiana's heightened summary judgment standard "consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley*, 15 N.E.3d at 1004. Summary judgment is rarely appropriate in negligence cases because they are "particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004) (internal citations and quotations omitted).

## II. Admissible Evidence

As an initial matter, Mary alleges that Appellants rely on "mere speculation in their statement of facts, argument, and appendix." Appellee's Brief at 10. Specifically, Mary's argument focuses on Appellants' reliance on Detective Sanderson's affidavit in which he gives his "impressions" from his interviews with Robert and Mary. *See* App. of Appellants, Vol. III at 85-86.

In ruling on a motion for summary judgment, a trial court may only consider material deemed appropriate by Indiana Trial Rule 56(E). *Duncan v. Duncan*, 764 N.E.2d 763, 766 (Ind. Ct. App. 2002), *trans. denied*. That rule provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies not previously self-authenticated of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

The affidavit requirements of Trial Rule 56(E) are mandatory and a court considering a summary judgment motion should disregard inadmissible information contained in supporting or opposing affidavits. *Id*. The party offering the affidavit into evidence bears the burden of establishing its admissibility. *Id.*

[12] At the summary judgment hearing, Mary alleged that Detective Sanderson's speculations were based solely on inadmissible hearsay and violated the Indiana Dead Man's Statute, arguing:

> Just to add an additional wrinkle to this case. It's hearsay. Whatever [Robert] told affidavit [sic] or told Detective Sanderson what is more it's in violation of the dead man [sic] statutes. He passed away in February of two thousand seventeen. So you need to have more evidence then [sic] [Robert] telling an Officer two and a half years after the incident yeah I did molest someone in the past. There is if they can point to any evidence from Mary Whipple stated yes I knew that he had done this act prior to December of two thousand nine after fifty hours of depositions, I am still looking for it. It's not there and that and I will leave it at that.

Transcript, Volume I at 34-35.

[13] However, on appeal, although Mary employs a subheading titled, "Appellants rely on hearsay and speculation as factual evidence," Appellee's Br. at 10, she never advances an argument regarding hearsay or the Indiana Dead Man's Statute. Indiana Appellate Rule 46(A)(8) provides that the argument section of the appellant's brief must "contain the contentions of the appellant on the issues

presented, supported by cogent reasoning," along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts under review. Because Mary failed to do so, she has therefore waived these arguments.[2] *See, e.g., Reed v. Reid*, 980 N.E.2d 277, 297 (Ind. 2012) ("Failure to comply with this rule results in waiver of the argument on appeal.").

[14] In place of those arguments, Mary alleges that Detective Sanderson's use of the word "impression" constitutes improper opinion testimony by a lay witness. Appellee's Br. at 10. "A mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an issue for appellate review." *Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008). As such, we view Mary's somewhat casual comments regarding hearsay and the Indiana Dead Man's Statute as insufficient to preserve the error of improper opinion testimony. Mary has therefore waived any objection and Detective Sanderson's affidavit may be considered. *See Riggin v. Rea Riggin & Sons, Inc.,* 738 N.E.2d

---

[2] Even if Mary had not waived the issue of the Indiana Dead Man's Statute by failing to advance an argument on appeal, the litigation involving Robert's estate is not before us. *See* ¶ 5, *supra*; Ind. Code § 34-45-2-4(a)(3) (the statute applies to suits or proceedings: "where a judgment or allowance may be made or rendered for or against the estate represented by the executor or administrator"). Moreover, rather than excluding evidence, the statute prevents a particular class of witnesses from testifying as to the claims against the estate, *Paullus v. Yarnelle*, 633 N.E.2d 304, 308 (Ind. Ct. App. 1994), and there is no evidence that Detective Sanderson is a "necessary party to the issue," Ind. Code § 34-45-2-4(d) (providing that for a witness to be incompetent to testify, with minor exceptions, they must be both "a necessary party to the issue or record" and have an interest which is "adverse to the estate"). Because Detective Sanderson would neither gain, nor lose, by the direct legal operation of the judgment, he does not have an interest which renders him incompetent to testify. *See Fisher v. Estate of Haley,* 695 N.E.2d 1022, 1028 (Ind. Ct. App. 1998) (holding that although the plaintiff was not a direct party to the action, because he stood to gain from a judgment for retained corporate earnings, he was therefore a "party to the issue").

292, 306 n.9 (Ind. Ct. App. 2000) (concluding that we may consider affidavits regardless of impropriety where party failed to adequately object to their admission).

[15] Waiver notwithstanding, we do not view Deputy Sanderson's "impression" statement as improper opinion testimony. Appellee's Br. at 10. Mary seemingly confines this argument to one instance: that it was Detective Sanderson's "impression that, prior to December 20, 2009, Robert B. Whipple informed Mary Whipple that he that he molested a child." App. of Appellants, Vol. III at 85. Opinion testimony by a lay witness is limited to those opinions rationally based on some combination of the witness's own personal observation, knowledge, and past experience. *Ackles v. Hartford Underwriters Ins. Corp.*, 699 N.E.2d 740, 743 (Ind. Ct. App. 1998), *trans. denied*. "Lay witness opinion testimony must not only be based on the personal perception of the witness, it also must be 'rationally' based on that perception. Thus, speculation or testimony based on improper inferences is inadmissible." *Id.*

[16] Here, Mary argues that Detective Sanderson does not have personal knowledge that "prior to December 20, 2009," Robert informed Mary that he molested a child. Appellee's Br. at 10. In context, immediately preceding that statement, Detective Sanderson stated that "Robert E. Whipple informed me that he had told his wife Mary Whipple that he had molested a girl in the past." App. of Appellants, Vol. III at 85. Thus, the issue becomes only whether Robert told Mary that information prior to December 20, 2009—the date of the first molestation underlying Appellants' cause of action.

[17] In *Satterfield v. State*, our supreme court explained:

> Helpful opinions are not exclusive to experts or skilled witnesses. Any witness "not testifying as an expert"—whether an ordinary lay witness or a skilled witness—may testify "in the form of an opinion" if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or determination of a fact in issue." Ind. Evidence Rule 701. "The requirement that the opinion be 'rationally based' on perception simply means that the opinion must be one that a reasonable person could normally form from the perceived facts," *Davis v. State*, 791 N.E.2d 266, 268 (Ind. Ct. App. 2003), *trans. denied*, which are facts received "directly through any of the [witness's own] senses," *Ashworth v. State*, 901 N.E.2d 567, 572 (Ind. Ct. App. 2009) (quoting *Kubsch v. State*, 784 N.E.2d 905, 922 (Ind. 2003) (defining "perception" under Evidence Rule 701)), *trans. denied*. And the witness's opinion is "helpful" "if the testimony gives substance to facts, which were difficult to articulate." *McCutchan v. Blanck*, 846 N.E.2d 256, 262 (Ind. Ct. App. 2006).

33 N.E.3d 344, 352 (Ind. 2015).

[18] Here, Detective Sanderson's "impression" is both rationally based on his perception and helpful to a clear understanding of his testimony. Indeed, even absent an express statement, there are countless context clues in the course of a conversation from which the recipient of information can determine, or at least opine, the order in which events occurred. Mary argues, however, that this "impression" is not rational considering Mary's and Robert's subsequent testimony—referring to the fact that both Mary and Robert denied having any such conversation. But this is no matter. As noted above, a statement is

rational if a reasonable person could form the opinion from the perceived facts and we need not look to other testimony to determine whether the opinion is consistent. *Davis*, 791 N.E.2d at 268. Therefore, even if Mary had not waived this issue for our review, Detective Sanderson's "impression" would nevertheless be admissible evidence for the trial court's evaluation on summary judgment.

## III. Negligent Supervision

[19] Having concluded Appellants' designated evidence was admissible, we turn to Appellants' claim that the trial court improperly granted summary judgment to Mary on the issue of negligence. We agree.

[20] Appellants advance two general theories of negligence against Mary: (1) negligent supervision; and (2) premises liability. *See* App. of Appellants, Vol. II at 18-19. For all claims of negligence, a plaintiff must show a duty owed to the plaintiff by the defendant, a breach of that duty, and a compensable injury proximately caused by the breach. *Kroger Co. v. Plonski*, 930 N.E.2d 1, 6 (Ind. 2010). We begin with negligent supervision.

[21] At the core of this appeal is whether Mary owed Appellants a duty of care because, "[a]bsent a duty, there can be no breach and, therefore, no recovery in negligence." *Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984, 990 (Ind. Ct. App. 2006) (citation and quotation omitted). Generally, the existence of a duty is a pure question of law appropriate for disposition by summary judgment. *Ind. Dep't of Transp. v. Howard*, 879 N.E.2d 1119, 1122 (Ind. Ct. App. 2008).

However, where factual questions are interwoven, the existence of a duty may be a mixed question of law and fact to be determined by the fact-finder. *Id.*

## A. Waiver

As a preliminary matter, Mary alleges that the Appellants waived arguments regarding "*in loco parentis,* custodians, and assumed duty" pertaining to the claim of negligent supervision because they "were not properly raised at the trial court level." Appellee's Br. at 7.

It is well established that Appellants "may not change [their] theory on appeal and argue an issue that was not properly presented to the trial court." *Pardue v. Smith*, 875 N.E.2d 285, 289-90 (Ind. Ct. App. 2007). "Nor may a party raise a new issue on appeal under the cloak of evidence relevant to a similar, yet distinct issue that was properly pled before the trial court." *Id.* This is based on notions of fairness which require an opposing party have notice of an issue which was not previously pleaded at the trial court level. *Id*.

We have explained, however:

> The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all it means is that substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward.

*Dedelow v. Pucalik,* 801 N.E.2d 178, 183-84 (Ind. Ct. App. 2003) (quotation omitted) (agreement expressed by *Wagner v. Yates,* 912 N.E.2d 805, 811 n.3 (Ind. 2009)).

With the exception of *in loco parentis*, which was not adequately developed until Appellants' reply brief, we conclude that Appellants sufficiently raised the issues they now argue on appeal. *See Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 593 n.6 (Ind. 2001) (noting that appellants are not permitted to present new arguments in their reply briefs, and any argument an appellant fails to adequately raise in their initial brief is waived for appeal). Accordingly, Appellants have not waived the remaining arguments.

## B. Duty

Returning to the core of this appeal—the element of duty—Mary argues that to determine whether a duty existed, we must look to the three-part balancing test originally outlined in *Webb v. Jarvis*: (1) the relationship between the parties; (2) the foreseeability of harm; and (3) public policy concerns. 575 N.E.2d 992, 995-97 (Ind. 1991). However, as our supreme court has long held and Appellants now argue, "a judicial determination of the existence of a duty is unnecessary where the element of duty has already been declared or otherwise articulated." *Rogers v. Martin*, 63 N.E.3d 316, 321 (Ind. 2016) (quotation and citation omitted). Here, we conclude that genuine questions of material fact remain regarding (1) whether Mary possessed a duty of care as a person to whom the care of a child was entrusted; and/or (2) whether Mary assumed a duty a care.

### *1. Entrusted with the Care of a Child*

[27] Appellants first allege, "The duty of a person who assumes custody of a child to exercise reasonable care for the safety of the child has already been declared and is well established in this state and throughout the country." Br. of Appellants at 13. Indeed, Indiana law recognizes a duty of care on behalf of a person to whom the care of a child is entrusted. *See, e.g., Vetor by Weesner v. Vetor*, 634 N.E.2d 513, 515 (Ind. Ct. App. 1994) (noting that child's grandfather "owed her a duty of reasonable care as the person to whom her care had been entrusted."). "The duty exists whether or not the supervising party has agreed to watch over the child for some form of compensation." *Davis v. LeCuyer*, 849 N.E.2d 750, 757 (Ind. Ct. App. 2006), *trans. denied*.

[28] In *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011), a sixteen-year-old accompanied her grandfather to a golf outing with the permission of her mother. Grandfather then volunteered granddaughter, who was unfamiliar with the sport of golf, to operate a beverage cart during the golf outing. After making several trips around the golf course, granddaughter was struck in the mouth with an errant tee-ball, injuring her mouth, jaw, and teeth. Granddaughter sued her grandfather alleging, *inter alia*, negligent supervision and, in turn, grandfather argued that he did not owe his granddaughter a duty of care. The trial court granted summary judgment in favor grandfather and we affirmed on appeal.

[29] On transfer, our supreme court declined grandfather's invitation to apply *Webb*'s three-part balancing test and instead relied upon the "well recognized

duty in tort law that persons entrusted with children . . . have a special responsibility by the common law to supervise their charges." *Id.* at 410. The court then concluded that a duty existed because granddaughter "was explicitly entrusted to her grandfather's care and supervision by her mother." *Id.*

[30] Here, it remains a question of fact whether Mother entrusted Child to Mary's care and supervision. *See Ind. Dep't of Transp.*, 879 N.E.2d at 1122 (noting the existence of a duty may be a mixed question of law and fact). Mother made the arrangements for Child to stay at the Whipples' home on the phone with Mary and Mary repeatedly invited Child to stay at the home and went so far as to give Child her own room at the residence. Mary told Mother that it was "all right" for Child to be with Robert until she returned home from work and that she would be home shortly after Child was dropped off. App. of Appellants, Vol. III at 50. On these facts, a reasonable factfinder could conclude that Mother entrusted Child's care and supervision to Mary, her own mother, and not to Robert.

### 2. Assumed Duty

[31] Alternatively, a factfinder could reasonably conclude that Mary assumed a duty of care. In *Yost v. Wabash College*, our supreme court explained:

> "A duty of care may . . . arise where one party assumes such a duty, either gratuitously or voluntarily. The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta*, [*Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999)] (alteration in original) (quoting

*Plan–Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1219 (Ind. Ct. App. 1983)), *trans. not sought*. The assumption of such a duty requires affirmative, deliberate conduct such that it is "apparent that the actor . . . specifically [undertook] to perform the task that he is charged with having performed negligently, 'for without the actual assumption of the undertaking there can be no correlative legal duty to perform that undertaking carefully.'" *Lather v. Berg*, 519 N.E.2d 755, 766 (Ind. Ct. App. 1988) (*quoting Blessing v. United States*, 447 F.Supp. 1160, 1188-89 (E.D. Pa. 1978)), *reh'g and trans. denied*; *see also King v. Northeast Sec., Inc.*, 790 N.E.2d 474, 486-87 (Ind. 2003) (quoting *Lather*). Where "the record contains insufficient evidence to establish such a duty, the court will decide the issue as a matter of law." *Delta Tau Delta*, 712 N.E.2d at 975. The liability for the breach of assumed duty is expressed in the Restatement (Third) of Torts: Physical and Emotional Harm § 42 (2012), which states:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
>> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
>>
>> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

Thus, to impose liability resulting from breach of assumed duty, it is essential to identify and focus on the specific services undertaken. Liability attaches only for the failure to exercise reasonable care in conducting the "undertaking."

3 N.E.3d 509, 517 (Ind. 2014).

[32] Mary argues the record contains insufficient evidence to establish a specific assumed duty, other than a "vague claim" of failure to provide care, and urges the application of our decision in *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E.2d 383 (Ind. Ct. App. 2000). Appellee's Br. at 18. Although Mary's argument is correct in the sense that we must "focus on the specific services undertaken," *Yost,* 3 N.E.3d at 517, we nevertheless find the designated evidence sufficient to create a question of fact for the jury.

[33] In *Merchants National Bank*, the plaintiff was shot and killed by another bar patron shortly after leaving a bar. After his death, his estate sued the bar alleging, *inter alia*, that the bar assumed a duty to protect its patrons from the criminal acts of third persons. In finding no assumed duty, we concluded:

> there is no designated evidence that [the bar], through affirmative conduct or agreement, gratuitously undertook a duty to protect [the plaintiff] from the unforeseeable criminal act of a third-party. The Administrator points to evidence that [the bar] provided security for its patrons on Thursday, Friday and Saturday nights when it featured a band. However, it is undisputed that [the plaintiff] was shot on a Tuesday night. The evidence is insufficient to establish, as a matter of law, that [the bar] assumed a duty to protect [the plaintiff] from [the] criminal act.

741 N.E.2d at 388.

[34] Here, we may generally categorize Mary's assumed duty as one to protect Child from the foreseeable criminal attacks of third parties. The facts underlying

Appellants' assumed duty argument are essentially the same as those underlying whether Mary had a duty as a person to whom the care of a child was entrusted. Similarly, the designated facts are sufficient to create a question of fact as to whether Mary engaged in "affirmative, deliberate conduct" such that it was apparent that she specifically undertook to protect Child from a foreseeable criminal attack. *Yost*, 3 N.E.3d at 517*; see also Merchants Nat'l Bank,* 741 N.E.2d at 388 (noting the "existence and extent" of an assumed duty "is ordinarily a question of fact for the trier of fact"). For, if a factfinder so concludes, this assumption of duty would create "a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Yost*, 3 N.E.3d at 517.

[35] Underlying our decisions in many assumption of duty cases is our reluctance to impute broad definitions of duty that essentially render a party the guarantor of another's safety. *See Hous. Auth. of City of South Bend v. Grady,* 815 N.E.2d 151, 160 (Ind. Ct. App. 2004); *Merchants Nat'l Bank,* 741 N.E.2d at 389; *Fast Eddie's v. Hall*, 688 N.E.2d 1270, 1274 (Ind. Ct. App. 1997), *trans. denied.* This concern, however, is not present where a party takes affirmative action in creating a foreseeable harm—as is alleged here. Accordingly, we conclude questions of fact remain regarding whether Mary assumed a duty to protect Child from the foreseeable criminal attacks of third parties.

# C. Breach

Turning to the second element of negligence—breach—Appellants allege this too remains a question of fact. We agree.

"The question of the breach of a duty is usually one for the trier of fact." *Cox v. Paul*, 828 N.E.2d 907, 911 (Ind. 2005). "However, if any reasonable jury would conclude that a specific standard of care was or was not breached, the question of breach becomes a question of law for the court." *Id*. at 912.

First, in the context of a duty of care on behalf of a person to whom the care of a child is entrusted, we return to our discussion of *Pfenning*, where a sixteen-year-old accompanied her grandfather to a golf outing and was struck with an errant golf ball. 947 N.E.2d at 397. In reversing the trial court's grant of summary judgment, our supreme court explained:

> While the mechanism of her injury, being struck by an errant golf ball, is not an unusual risk to adults on a golf course, a possible viable claim for breach of duty is nevertheless shown by the particular circumstances of the present case. The grandfather does not challenge the facts and inferences indicating that he was aware of the plaintiff's age, her lack of familiarity with golf, and particularly her lack of awareness of the risk of injury from wayward golf balls. The designated evidence does not establish that the plaintiff's mother was aware of and agreed to her daughter's exposure to such risks. As to the issue of breach of duty, whether it was reasonable for him to subject her to such risks depends upon genuine issues of fact for determination at trial.

*Id.* at 410. Although the mechanism of injury here is quite different from that of *Pfenning*, we find its reasoning persuasive regarding negligent supervision of a child and its accompanying standard of care.

[39] Taking the facts, as we must, in favor of Appellants, the designated evidence supports a finding that Mary breached her duty of care when she allowed Child to be left alone with an individual, indeed her husband, whom she knew to have previously molested a child. Perhaps more importantly, however, knowing this past, Mary reassured Mother that it was "all right" for Child to be left alone with Robert until she returned home from work in Indianapolis. App. of Appellants, Vol. III at 50. And, like *Pfenning*, the evidence fails to establish that Mother was aware of and agreed to Child's exposure to such risks and a determination of whether it was reasonable for Mary to subject Child to such risks "depends upon genuine issues of fact for determination at trial." *Id.* at 410.

[40] As to breach of an assumed duty, Mary argues simply that "absent a duty, there can be no breach." Appellee's Br. at 20. However, in her motion for summary judgment, Mary relied on Restatement (Second) of Torts Section 315[3] for the proposition that generally a person has no duty to control the conduct of a third

---

[3] There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless

    (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

    (b) a special relation exists between the actor and the other which gives to the other a right to protection.

person, nor to warn those endangered by such conduct, in the absence of a "special relationship" either to the third person or to the victim. Appellants' App., Vol. II at 216-17.

[41] Finding no Indiana precedent directly on point, we turn to *Pamela L. v. Farmer*, 112 Cal. App. 3d 206 (1980), where the Second District (Division 5) of the California Courts of Appeal addressed an analogous factual situation and faced a similar argument on appeal. There, three minors sued a husband and wife alleging, *inter alia*, negligence arising from husband's sexual molestation of the minors in their home. The minors alleged that wife already knew of husband's prior history of molesting women and children but nevertheless encouraged and invited plaintiffs to use the swimming pool at her house and told plaintiffs' parents that it was safe for their children to play at her house while she was at work and her husband was home. In holding that wife had assumed a "special relationship," the court explained:

> Respondent cites the principle that generally a person has no duty to control the conduct of a third person, nor to warn those endangered by such conduct, in the absence of a "special relationship" either to the third person or to the victim. However, this rule is based on the concept that a person should not be liable for "nonfeasance" in failing to act as a "good Samaritan." It has no application where the defendant, through his or her own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person. In such cases the question of duty is governed by the standards of ordinary care.

This latter principle is embodied in Restatement Second of Torts section 302B which provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

Here respondent did not merely fail to prevent harm to plaintiffs from [her husband]. Respondent by her own acts increased the risk of such harm occurring. According to the allegations . . ., respondent "encouraged and invited" the children to play in her swimming pool, prepared refreshments to "entice" the children, and "encouraged the parents . . . to permit" the children to come to her premises by telling them it would be perfectly safe for the girls to swim when respondent was not there, because her husband would be there. This was done, it is alleged, with knowledge that [her husband] had molested women and children in the past and that it was reasonably foreseeable he would do so again if left alone with the children on the premises. By encouraging and inviting the children to be alone with [her husband] under circumstances where he would have peculiar opportunity and temptation to commit such misconduct, respondent could be held to have unreasonably exposed the children to harm.

*Id.* at 209-10 (citations and footnote omitted).

[42] On these surprisingly similar facts, we find *Pamela L.*'s reasoning appropriate here, too. Accordingly, the designated facts are sufficient to create a question of fact as to whether Mary undertook a "special relationship" with Child and, more importantly, whether Mary breached a duty of care by permitting—or even encouraging—Child to be left alone with someone she may have known to have molested a child in the past.

# D. Proximate Cause

Finally, Appellants argue the trial court's grant of summary judgment was inappropriate because proximate causation remains a question of fact. Again, we agree.

A negligent act is said to be the proximate cause of an injury "if the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000).

> Proximate cause in Indiana negligence law has two aspects. The first—causation in fact—is a factual inquiry for the jury. If the injury would not have occurred without the defendant's negligent act or omission, there is causation in fact. A second component of proximate cause is the scope of liability. That issue, which is also for the trier of fact, turns largely on whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." Under this doctrine, liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission.

*City of Gary v. Smith & Wesson*, 801 N.E.2d 1222, 1243-44 (Ind. 2003) (citations omitted).

On appeal, Mary argues that Robert's actions constituted "intervening criminal act[s] of a third party" which broke the causal chain of liability as it relates to Mary, Appellee's Br. at 24, because the "willful, malicious, criminal act of a third party is an intervening act which breaks the causal chain between the

alleged negligence and the resulting harm." *Id.* at 23-24 (quoting *Fast Eddie's*, 688 N.E.2d at 1274).

[46] On this point, we turn to our supreme court's decision in *Frankenmuth Mut. Ins. Co. v. Williams by Stevens,* 690 N.E.2d 675 (Ind. 1997). There, a babysitter's husband molested one of the children in her care and while examining the child's claim of negligent supervision and the insurance company's motion for summary judgment based on exclusions in its policy, our supreme court explained:

> Where a person's negligence creates a situation in which a third party might commit an intentional tort or criminal act, the negligence is not a proximate cause of any resulting injuries unless the negligent person "realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." Restatement (Second) of Torts § 448 (1965); *cf. Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 520–21 (Ind. 1994) (holding as matter of law that voluntary and willful suicide constitutes intervening cause). A factfinder in White's case would have had to decide (1) whether she was negligent and (2) whether she knew or should have known that her husband would molest [the child].

*Id.* at 678. Therefore, if it can be said that Mary realized or should have realized the likelihood that such a situation might be created, and that Robert might avail himself of the opportunity to commit such a tort or crime, then Mary may still be found liable for her negligence. *Id.*

Here, we conclude that because the record contains conflicting evidence regarding Mary's role in Child being left alone with Robert and whether Mary knew or should have known about Robert's past, both components of proximate cause—causation in fact and scope of liability—remain questions of fact for the jury. Accordingly, the trial court's grant of summary judgment was inappropriate.[4]

# Conclusion

Because genuine questions of material fact remain regarding all three elements of negligence, the trial court erred by granting summary judgment. We therefore reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

Crone, J., and Bradford, J., concur.

---

[4] Because we conclude genuine questions of material fact on the issue of negligent supervision remain, we need not address the alternative negligence claim based on premises liability.